Good morning, your honors, and may it please the court. I'm Thomas Burns. Along with my associate Arda Goker, we represent Dr. Aldissi and Dr. Bogomolova. A scheme to deceive is different from a scheme to defraud. The difference is that deceit doesn't harm the victim, whereas fraud does. This is a case where we can see that there were numerous material deceptions that the scientists engaged in. And had they absconded with a loot, they surely would have committed wire fraud. But the unique part of this appeal is that the scientists fully performed and always intended to fully perform. So they delivered their deliverables timely, they were accepted by the agencies, they were paid, they were rated as highly satisfactory, they survived the agency post-mortems, and a lot of their work was published. And in fact, the prosecutor in this case did not charge, or he removed the charges about full performance, and he didn't argue performance or the lack of performance to the jury, and said to the district court and to the jury, he said performance was just irrelevant because as soon as you obtain the money through deception, you have committed wire fraud. So the first two questions that I consider when considering a wire fraud are, number one, who is the victim? And number two, what money or property was obtained? Here the prosecutor conceded that the only victim, or victims were, of the wire fraud rather, were the agencies themselves and not other researchers. So we know the answer to that question. The second question is what money or property was obtained? And here we have a general verdict, we don't have a special verdict for them. So there are two possible theories that could have been established by the evidence. One is the right to control spending theory, if that were property. And the other is whether the grants themselves, these contracts to perform research, was the money or property obtained. So my obligation, or burden here rather, is to attack both of those and explain why they are not money or property obtained within the meaning of the wire fraud statute. So let's start with the right to control spending theory. Can I back you up just one second and ask a question? You, of course. You say the government conceded that there were no other victims besides the agencies. Why wouldn't the other research scientists who were eligible for these funds and applying who did not receive the grants be victims as well? Well, I've not, I believe there was actually a jury instruction on that point, about who the victims were. So that... Again, I'm taking the case as it comes to me. I'm just asking the question above and beyond what's been said before. Right. Is that correct? Okay. So I guess my first part of my answer is I don't think that's part of the verdict because the jury was instructed that they're not the victims and so they couldn't have Why would they? Go ahead. Don't let this slow you down. Right. Yeah, I can't. I mean, I remember that transcript and it's addressed in the brief but it's outside of the scope of this appeal because... Maybe you are. Okay. I'm sorry. So there's a circuit split over this right to control spending theory. And it's a little bit hard to categorize. Each time I read these wire fraud cases it seems like I could almost put them in one column or the other. But the way that I categorize it in the brief is that there was a 6-3 circuit split where six circuits have said that the right to control spending can be considered a form of property and three of them have said it's not. And I'm asking you to adopt the minority rule here because I think the majority rule is unsound. And it's unsound because the Supreme Court has repeatedly narrowed the scope of fraud statutes, both wire fraud and mail fraud, in a series of cases with which I'm sure you're And in each of those cases we've said, well, it's got to be property. It's got to be even intangible property counts but it's got to be property in the victim's hands. It can't be merely a regulatory interest and it's got to be transferable. And here the right to control spending is really best understood as a sovereign right that's regulatory. So it's just agencies deciding where they're going to spend their money and that's not something that could be obtained by a private individual because here the scientists couldn't say, oh, we're actually grabbing this right from you agency about who to decide to fund with these research grants. So it's not property. And there's some additional reasons why it's not property. Normally with property it's a bundle of sticks. The rights are like a bundle of sticks and you could do all sorts of things with them. Here the right to control spending has none of those attributes. The agencies couldn't exclude or enjoin other researchers from performing the same research if they want to do it on their own. They couldn't prevent those researchers from getting their own intellectual property. And you can't, you know, the agencies couldn't transfer their sovereign right to a private individual or other entity to fund these researchers. So it's not property. And even if you were to think that this was ambiguous, you'd have to apply the rule of lenity and you would say, no, you know, you could go either way on this and we're going to say that that's not property. So I think you should adopt the minority rule as to the right to control spending. But my job isn't done at that point. I still have to show you that the grants themselves were not money or property obtained. And here that turns on what is the nature of the bargain that was struck between the agencies and the scientists or all researchers. And here, I think this is, in a lot of senses, the meat of the appeal. So you're going to have to look very closely about how these programs are set up and what the contracts say and what the researchers were doing. But speaking generally, the SBIR and STTR programs are designed to fund small companies doing research. And it's very important. Lots of, you know, great developments have happened because of funding small companies doing this commercialization. It's, yes, that is a very important part of these programs. It's not just funding research for the sake of research. It's to have a vibrant research community. And if you have a vibrant research community, you're going to have these incredible breakthroughs that are so important for our country. So with that purpose in mind, it seems to me that what the government bargained for was to have research performed in a lab with the proper equipment, with specific staff members, and the support of universities or well-known professors. Why isn't that the bargain? The bargain has to do with the ultimate output, not how you get there. And here, that's something that the prosecutor could have charged and could have tried to prove. But instead, what they did, it's sort of like a Marie Antoinette argument where they're, on the one hand, saying, well, we don't want to have this evidentiary burden of proving beyond a reasonable doubt that you didn't perform. But we want the benefit of you concluding that they didn't perform. And we also want to deprive the defendants of notice that that's what they must defend at the trial. And here, I don't think that's the right question. The government failed to charge performance. And our position was that we did fully perform. And had that been charged, we would have proven that. And even at the trial, I think we did prove that we performed. That has to do with the deliverables. But that doesn't really go to performance. It goes to what the government, the way in which the contract, essentially, was to be performed. And the government has all these rules about how it's to be performed. And I think you admit that the government has lied to you about those things. Yes. I captured those on page 12 of my brief, the appellant's brief. There's a whole series of material deceptions. And we absolutely concede that those certainly took place. Right. And all of those things make commercialization more likely. And the government didn't get that here. I would disagree with that. But it's something that you have to decide for yourself, obviously. The ultimate deliverable is what we think matters. And because we delivered and fully performed, it had no impact on commercialization. And to the extent the government says it did have an impact on commercialization, that's speculation. It had no impact on commercialization when, if somebody wanted to go try to commercialize this product, it would be using fraudulent research. So they'd have to disclose that there was no outside lab, there was no co-institution, there was nobody but the two people. So why didn't it have a direct impact on the opportunity for commercialization? It's almost like it couldn't possibly have been commercialized using it once the truth came out. It could have been if that had been a theory that was charged in the indictment and then proved. Here what we have is kind of a disconnect between the indictment, the theory that the prosecutor repeatedly stated he was prosecuting under, and then the evidence at trial. So had the government charged in the indictment, we think you guys didn't perform properly. And then the evidence says that at trial, or the evidence is what the evidence was at trial. And then we come to the general verdict and we get this general verdict. I'd be in a very difficult position making the argument because essentially then the jury, one way you could read that jury verdict is to say, well, you screwed up. Your research is still What is your theory then? Are you talking about a material variance that they're trying to affirm the verdict on from the indictment? Or what is the theory? I'm missing your theory here as to what the problem is. One of my theories is that there is a material variance. And I addressed that on page 47, footnote 14 of my appellant's brief and pages two to seven of my reply brief. So there's a disconnect between what's been charged and what's been proven at trial. And because of that, that affects the way that you read the jury actually found. And that's part of, I think, the disagreement. What other theory do you have besides that? I don't see how you were prejudiced by any variance, if there was a variance. I'm just trying to understand the legal theory you're It doesn't even technically require a victim. It doesn't refer to a victim in the statute. It's just an intent to deceive, a scheme to deceive through material. A scheme to defraud. And our view is that because it says scheme to defraud, that it's focused on harm to the victim. The statute doesn't say that, but it's just our position that that's how the case law has developed in this area. So our theory, it's the variance and that we didn't undermine the nature of the bargain by delivering them what they No defrauding of the victim. I'm sorry? No defrauding of the victim because there was no harm to the victim. Precisely. So we're saying we gave you the benefit of your bargain. You bargained for research at a certain price, and we delivered that. And you accepted it, and it was timely and all of those things. So because you got the benefit of the . . . it's like a no harm, no foul kind of argument. But you do, like Judge Pryor, you said, you do have to look at how all of this was done. I think that's an appropriate consideration. One of the other things that I wanted to talk about very briefly is the Maxwell case. Let me ask you this. I'm over-given of sports analogies, so bear with me. We have a 12-year-old baseball team, and you're a 13-year-old pitcher. You're ineligible. Do we use a different sport? No, I like baseball. Okay, all right. I wasn't allowed to play baseball. It's the Pitcher's and Catcher's Report last month. Okay. And this is in honor of Judge Choflat, too. Okay. So you show up, and you perform. You strike out every batter you face during the season. Everything goes well, except I have to later admit that I have a 13-year-old pitching for my team, and you're pitching against 12-year-olds. Why wouldn't that be kind of what's going on here? You're saying, look, we performed. We misrepresented that we had the facilities and the credentials, at least from a physical facility standpoint, to do all these things. But we actually did the job. That's a great question. It's why I think Maxwell is a correct decision but is distinguishable, and that is because that misrepresentation goes to the core purpose of that program or that league. Why didn't commercialization or ultimate commercialization, the core purpose of this program, similarly? And so Maxwell involves a socially more laudable goal, but this involves an integral business goal. Right. The commercialization thing is not something – I guess my response to that is I don't think that's part of the verdict because it wasn't – performance wasn't charged properly. It was just the misrepresentation. My point is regardless of whether performance was perfect, there are still problems that would have to later be disclosed about the performance and the problems with the research to begin with. Therefore, the government's deprived of its bargain, of its side of the bargain. Okay. I had thought about that mostly in terms of eligibility for it, which is kind of the hypo that you had put forward, and here these companies were eligible because they're small businesses. My point is all our victories at the end of the season could be vacated because we had a 13-year-old pitching, just the same way the research here could be later at least called into question if not invalidated because there were misrepresentations made about what was going to be used in terms of the research. I don't think that would invalidate the research. The parts that might cause problems are the stuff about the tools that were used, but the facts that different people didn't do that I don't think would call that. It's just producing data, and they're reporting that data, and then a lot of times they were publishing that data. So I don't know that it would undermine it. Again, I don't know that's part of the verdict. Okay. I'm past my time. We'll give you your full two minutes. Okay. Thank you. May it please the Court, Roberta Bodner for the United States. The agencies did not get the benefit they bargained for. As the Court points out, the point of these programs is commercialization. The things that these defendants lied about were all things that went to the heart of that goal, the involvement of industry professionals and university professors, the involvement of key people within those spheres, people who are well known as the leading voices in water purification or battery technology. All of those things were considered by the agency decision makers because in this very competitive program, those were key components of whether or not what the defendants proposed could meet the commercialization goal of these programs. We did not get any of that with this end report that they turned in. We didn't get the benefit of our bargain. I don't think that the other businesses who presented proposals could be considered victims for purposes of restitution, and I think that's the context that their not being victims came up in. But when it comes to whether or not the goals of this program were met, that there were other companies out there with worthy proposals that were not selected is absolutely key to understanding how these agencies were defrauded. Because there were people out there we could have funded, and we were deprived of that benefit. I don't think the court has to go any further than the Ticola case to resolve the sufficiency issue here. Right to control theory has nothing whatsoever to do with this case. That's a theory that comes up in honest services fraud cases, in the kickback and bribery scheme cases. That's not what this is. This is a simple misrepresentation, and I say simple. It was clearly a misrepresentation, but there were a very lot of them, and they were important. We relied on those misrepresentations, and we did not get the benefit of our bargain. Now, I'd like to talk for a minute about this notion that we didn't charge anything to do with performance. That is not true. We charged a scheme to defraud under the wire fraud statute. The scheme went from the formation of these companies on through to the creation of these forged documents, the submission of those documents and the proposals, an award based on those proposals, and the money, which after all was the point to the defendants getting the money. You only get the money if you turn in a report, an interim report or a final report. They got that money. The scheme went all the way down to the obstruction of justice, going to Craig Johnson and getting a letter that says, oh, yeah, they had access to our lab to do their research. The research here was integral with the fraud, and the submission of these reports and the supposed product that they produced, the creation of this research, was just an act in furtherance of the fraud. The performance itself was grounded in fraud. So it's absolutely incorrect to say that they're not guilty because they performed and turned in a word processing document with data in it. Now, there is a separate question of their eligibility. They were ineligible because they were employed by other entities. Aldisi was employed by the university in France. Comorova was employed by Kegel. Neither of them could have served as PIs on any of the proposals during those time periods. Each defendant listed the other in their proposals as employees of the two companies. They couldn't be full-time employees of two companies at the same time. So all of the proposals that they submitted, they were ineligible. And then they were ineligible because they were out of the country while they were doing the research, both of them, at least for some of these. And they were ineligible because they were not the intended type of researchers. Yes, they were small businesses, but that's not as far as the program goes. They didn't have any of the ingredients for commercialization that they said they had. So from that perspective, they were unintended recipients too. These programs are intended to fund small businesses that can produce the next Qualcomm chip, a business that can produce the next laser eye surgery. That's the point, and that's not what we got. The defendants bring up this material variance notion, by the way, in a footnote. That's not an argument fairly raised, and it's certainly not an argument that was ever presented to the district court. They made their objections to anything that had to do with performance at trial as evidentiary objections, arguing that arguments to the viability of the research were not relevant based on the charges. There's never been a court ruling about whether this was a variance, and they certainly didn't present that fairly in their case. It's a curiosity question, but the president of Florida Hitech Corridor Council testified at trial that there were multiple awards and proposals in which the defendants falsely claimed to have access to that council's research facilities. And I take it the evidence would show that there were multiple occasions on these other awards where they made these other similar misrepresentations. Yes. How did this go on for so long without being dismissed? There's lots of testimony that the agencies do not have a budget to go and investigate the support letters that researchers put in with their proposals, and they don't have the ability to go back and replicate the science to make sure that it's being done correctly or anything like that. The I-4 Hitech Corridor Program is a matching funds program that the defendants early on at one point had participated in as funders. I guess that's how they found out about it. It was never the kind of program that provided access to facilities that they represented it to be. It just sounded good. It just sounded good, just like having Dragan Nabredzic from Maxwell Technologies as a supporter sounded great, even though he was not at Maxwell anymore when they used that letter. Just like using the picture of the photoreactor that didn't even exist anymore sounded great. Didn't they have for their business address their home address? They certainly did. Nobody even confirmed there was a business location at the agency because it clearly would have shown. I mean, go on Google Maps and see it's a house. Well, that's actually how we found out about what tipped us eventually. Someone thought that the address looked wrong and someone started asking questions, and that's when the defendant created the false documents with respect to the... I'm just surprised somebody didn't call some of these research facilities at these universities and check for the interest. They recognized the names, and that's why they didn't. They recognized the names. They knew that David Mazak was the leading person in water photochemistry. He was the NASA guru. Everyone went, oh, David Mazak, this must be good. And, in fact, that aspect of the science let a lot of these proposals go through. There was a witness who testified from Northrop Grumman about a proposal for coding technology on airplanes, and he testified that Northrop Grumman would never have anything to do with an idea like the defendants were proposing because it would interrupt the stealth technology coding on the airplanes that Northrop Grumman participates in building. Yet the reviewers get a proposal and they see, oh, Northrop Grumman, they've got Terry Hall involved. It must be good science. Now, what we didn't do at trial, we did not try to replicate $24 or $10.6 million worth of research in science. And, for the most part, except for things like Terry Hall testifying that this was not technology that Northrop Grumman would ever support, we didn't, for the most part, attack the underlying science because there's no practical way for us to do that. But we never, ever suggested that the research they submitted in their final products in order to get paid was actual performance. We said from the beginning that that performance didn't matter because it was grounded in fraud. And we also argued in the same breath that, in any event, we did not get what we bargained for because we bargained for eligible principal investigators. We bargained for industry individuals involved in the research who would help take the research from the laboratory to the marketplace. We bargained for these experts who were going to add their knowledge to the proposal and help to make the product. And, you know, if a reviewer thought that Terry Hall had blessed the research, well then, maybe it looked like something that they could fund. Was your position at trial that this fraud affected both sides of the award market, both the awarders and those deserving small businesses who would receive the award? I think Brown testified to that in some respect. There were lots of other people who could have gotten the awards. Edsel Brown talked about how competitive the program is. One of the witnesses who was talking about the battery technology proposals said that the point difference between the defendants who got the proposal awarded and the next person down was only two points. And I want to say something like 10 points had to do with facilities alone. Had they known they didn't have facilities, somebody else would have gotten that proposal. So yes, there was a wealth of testimony that these fraudulent misrepresentations were the make it or break it. And they were the difference between these defendants getting $10.6 million . . . And he's conceded all along there were multiple material misrepresentations. Yes. That's not been the issue here. No, their defense was grounded on . . . It was a wealth of fraud. The whole thing was a sham and fraud. Yes, yes. They now are trying to say there's no harm to the United States. And I want to ask you about jury instruction number 12, which is one of the ones that gives you the elements of the crime. And I think there's a response to it, but I want to make sure I understand what the government's position is. And the charge is the intent to defraud is the specific intent to deceive or cheat the United States, usually for personal financial gain, that would be the defendant's financial gain, or loss to the United States. Yes. Okay. So we know or loss to the United States for their own defraud, for their own personal financial gain. Is that gain, is that enough under the wire fraud statute? It is. Or does it have to have a victim who lost something? Are you following my question? I am. And I think that the confusion here is that we're mixing up two concepts. The Tikaloff case, which came out after this trial, was about whether material misrepresentations went to the circumstances of the deal, whether it changed the deal. The defendants have argued factually that we got the benefit of our bargain because we gave you this word processing document with data in it. That is a different question than what they tried to address with their jury instruction, which was they argued that the United States had to prove that we had had a financial loss. And the court understands how these programs work. This isn't an accounting program for the United States. Yes, the United States would have funded somebody else. This wasn't a financial loss. We were deprived of being able to spend this research money on a worthy program. So there's the disconnect. But the instructions that the court gave accurately explained that a scheme to defraud requires misrepresentations with the specific intent to deceive or cheat the United States out of money or property. There was no difficulty with the jury understanding from that instruction. Is it also sufficient if the scheme is just not so much to cheat the United States of financial loss because, as you said, it's not really out-of-pocket loss because they're going to spend the money anyway. Is it sufficient if it's just for their own financial gain under the wire fraud statute? That's right. Yes, it is. And what would tell me that? Is that part of the standard charge? Well, the elements of the offense, the scheme to defraud and the use of the wires. So it's okay if the scheme is for their own gain? That's right. Because they certainly gained here by their fraud. They got $10 million. That's right. And that the harm to the victim is irrelevant, you're saying? Well, I'm saying that Maxwell addresses that. And Maxwell says that financial loss to the United States is not at the heart of the program and that Maxwell involves a different small business program. But financial harm is not at the heart of the wire fraud statutes. It does have to be property. We understand that. But this was property. This was a very lot of money. It's just that whether or not there was a fraud doesn't depend on the United States balance sheet at the end. Before you sit down, let me ask you a question about sentencing. Yes, Your Honor. Particularly with regard to the loss amount. Yes. This is of the 22-level enhancement. What is the evidence that supports the $20 million? $24 million. Intended loss. What the district court found, the district court applied the guidelines manual straight out of the book and said that loss is the greater of intended loss or actual loss. The intended loss was the $24 million in proposals they had submitted since 1999. And the basis for that in the record is this folder of letters. Government's Exhibit 52, I think it is. And the court has that in the exhibits in our appendix. Those go back to 1999. They were faking letters since then. So that was the basis for the court to say it's a reasonable estimate that the amount of the intended loss was everything that they asked for since they started supplying fake letters. And then, you know, the court went from there. And there was no offset for the research that was performed because it wasn't the research we paid for. That's not what we bought. Thank you. I'd ask the court to refer. There's a couple of things I want to run through very quickly. The commercialization part, it's important to remember that these are Phase I and Phase II contracts, not Phase III. So just consider that as part of your analysis. The government has mentioned that key people were involved, but also remember that Dr. Aldisi was probably the foremost person in his particular field, and Dr. Bogomolova was also pretty good. The government, I think, misspoke when she said the concession about victims had to do with sentencing. It did not. It had to do with who the victims of the wire fraud were, and that's found at DOC 378.15, page 68. The performance charges, what I'm specifically talking about is DOC 1, page 13, paragraphs I, K, M. Those are withdrawn from the superseding indictment, and that's why we're saying that there's no performance charges here. The government said that we didn't raise the variance argument. They're mistaken. It's a footnote that's nine lines long. Cites a case. There are two record citations in there. And then I amplify that in the reply brief, and under this court's case law, that counts. So you need to consider the variance argument, whether it prevails or not. And then the really two central things that you've got to look at in this appeal, I think the two most important cases are Takalov and Maxwell. And the government and I, like, I think we generally agree that those are the most two important cases. You need to look at them, interpret them, and apply them to the facts of our case. If we were to agree with the government's argument that the scheme was grounded in fraud from the beginning in terms of the work to be done, the performance itself, in light of Takalov and Maxwell, would that not require affirmance, at least as an issue? If they had properly charged, you failed to deliver, and we failed to deliver, then, yes, that wire fraud counts. I just failed to deliver, but that the misrepresentations went to the research that was to be performed, not just whether they were eligible, but to the research itself. So, like, to the quality of performance? For example, saying a cardboard box is a darkroom. Right. Saying that a residential address is a business facility in which the research will be conducted, at least in part. My answer is I disagree with that reading of the indictment, that that's properly in the case, but if that were part of the case, then yes, I think that is wire fraud, because I would go to not just the fact of delivering the performance, but the quality of the performance. So it's really about what is the nature of the bargain that was struck, and how did you perform? The government's taking the position that harm to the victim is not a consideration. That's at the heart of the wire fraud statute. The Takalov case says that when the Maxwell case says it's not, it's in a different context when it's talking about a different set-aside program, and there it's saying, well, the fact that you delivered doesn't mean anything because you undermined this particular set-aside program, because that was set-aside for minority-owned businesses and you weren't that, so that's wire fraud. So that's how I harmonize those two cases. The final point is this $24 million loss. I haven't seen that evidence, and I was there at the sentencing, and the government I think is speculating that all of those proposals were materially deceptive, and I don't know that they were, so I think there needs to be fact-finding about that particular issue. Well, were there proposals on the face of them that they made that would get you to the $20 million? There were proposals, but there was no showing that they were materially deceptive. If you were to vacate and remand for that, that we would want an evidentiary hearing about deceptiveness. Do they have any documents of those proposals? Did they put in any evidence or just a witness? I don't remember. I'm sorry, I talked over you. There was a summary witness I believe that said there's $24 million of proposals, but it didn't establish that they were deceptive, so it's just the deceptiveness component of it. Did they say anything? They represented they have labs, they were affiliated with institutions, and all of these would give us any meat on what the proposals were. Not to my recollection. We have to look at the sentencing transcript and see how good the evidence was. Exactly. How would the variance affect that, though? The sentencing? To the extent there's a problem with some of the guideline calculations and the additional loss calculation. Oh, the enhancement is what you mean. Yeah, sorry. How would the enhancement be affected by the 50% variance from the mid-range? I don't remember the exact calculation, but it was a big number that they ended up with. In fact, the first PSR had recommended a life sentence for LDC, and it was largely because of the loss calculation. $324 and up. That's the final one, yes. But the first one before the lawyers got involved was recommending a life sentence. Let me say this, too. I thought your brief was excellent. Thank you. I wanted to say that before we get out of here today. Okay, thank you. I appreciate it. Unless there are any further questions, we would ask the Court to either reverse the judgment or vacate and remand for further proceedings. Thank you. Court is adjourned until tomorrow morning at 9 o'clock.